# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

TOUCHCOM, INC. AND TOUCHCOM
TECHNOLOGIES, INC.,

        Plaintiffs,

v.

BERESKIN & PARR AND
H. SAMUEL FROST,

        Defendants.

CIVIL ACTION NO. 1:07-CV-114

---

# DEFENDANTS' MOTION TO STRIKE
# CERTAIN EXPERT DISCLOSURES AND MEMORANDUM IN SUPPORT

# REDACTED PUBLIC VERSION

Monplaisir G. Hamilton
Va. Bar No. 76005
Peter E. Strand (*pro hac vice*)
D.C. Bar No. 481870

SHOOK, HARDY & BACON L.L.P.
1155 F Street, N.W., Suite 200
Washington, D.C. 20004
202-783-8400 – Telephone
202-783-4211 – Facsimile

John H. Martin (*pro hac vice*)
Texas State Bar No. 13086500
J. Michael Heinlen (*pro hac vice*)
Texas State Bar No. 24032287

THOMPSON & KNIGHT L.L.P.
1722 Routh Street, Suite 1500
Dallas, Texas 75201
214-969-1700 – Telephone
214-969-1751 – Facsimile

ATTORNEYS FOR DEFENDANTS
BERESKIN & PARR AND H. SAMUEL FROST

# TABLE OF CONTENTS

Table of Contents .................................................................................................................. 1

Table of Authorities ............................................................................................................. 2

Background and Introduction ................................................................................................ 3

Arguments ............................................................................................................................ 5

A. Mr. Santicola's Opinions Regarding Message Transmission, Communication, and Processing Should be Struck as Unreliable ....................................................................... 5

1. Scientific Testimony Must be Reliable ......................................................................... 6

2. Unsupported "Expert" Opinions Should Be Rejected .................................................... 7

3. Mr. Santicola is Not an Expert in the Field of Invention and His Opinions Are Unreliable ........................................................................................................................ 8

   a.   Mr. Santicola's Opinions Regarding the Transfer of Input Responses to the CPU are Unreliable ........................................................................................... 10

   b.   Mr. Santicola's Opinions Regarding the Identification of the Alleged CPU are Not Based on Scientific Fact ........................................................................... 12

   c.   Mr. Santicola has "No Idea" How Input Responses are Processed on the CPU 13

   d.   Mr. Santicola's Opinions Regarding the Transmission of Transaction Data are Not Supported by Any Technical Analysis ...................................................... 14

B. Dr. Beazley's Rebuttal Expert Report is Untimely and Improper .................................. 18

Conclusion .......................................................................................................................... 19

Certificate of Conference ................................................................................................... 21

Certificate of Service ......................................................................................................... 21

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bridgeman v. Deere & Co.*,
   Civil Action No. 2:07-cv-613, 2009 WL. 1344948 (E.D. Va.) ...........................7, 17

*Christianson v. Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988) ...................................................................................18

*Cooper v. Smith & Nephew, Inc.*,
   259 F.3d 194 (4th Cir. 2001) ..........................................................................6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .........................................................................6, 7, 10, 12, 19

*Gen'l Electric Co. v. Joiner*,
   522 U.S. 136 (1997) ......................................................................................7

*Scott v. Mid-Atlantic Cable, Installation, LLC*,
   Civil Action No. 1:05-cv-970, 2006 WL. 2079373 (E.D. Va.) .......................7, 8, 17

*Sharer v. Tandberg, Inc.*,
   Civil Action No. 1:06-cv-626, 2007 WL. 983849 (E.D. Va.) ....................6, 7, 8, 17

*Sundance, Inc. v. Demonte Fabricating LTD*,
   550 F.3d 1356 (Fed. Cir. 2008) .........................................................................7, 17

*Touchcom, Inc. v. Bereskin & Parr*,
   574 F.3d 1403 (Fed. Cir. 2009) .........................................................................4, 18

*Touchcom, Inc. v. Dresser, Inc.*,
   427 F. Supp. 2d 730 (E.D. Tex. 2005) .....................................................................3

*United States. v. Agyepong*,
   Case No. 09-4643, 2010 WL. 2852653 (4th Cir. July 21, 2010) .............................18

*United States v. Barnette*
   211 F.3d 803 (4th Cir. 2000) ...........................................................................6

### FEDERAL STATUTES

FED. R. EVID. 702.........................................................................................3, 6, 10, 12, 19

Plaintiffs submitted two expert reports of Mr. Ronald P. Santicola in support of their allegation that certain accused products infringe U.S. Patent No. 5,027,282 (the "'282 Patent"; attached as Ex. A-1). The '282 Patent relates to automated fuel-dispensers and claims a computer system with software architecture that transmits and processes messages between hardware and software components of the system. Although Mr. Santicola has experience operating fuel dispensers and their related point-of-sale systems ("POS"), and has even overseen their installation, he admits he is not an expert in certain technical fields about which he offers opinions. Mr. Santicola's opinions on these technical issues are not supported by any technical analysis or scientific knowledge. They are therefore unreliable under Fed. R. Evid. 702 and should be struck.

Plaintiffs' other technical expert, Dr. David Beazley, also submitted a Rebuttal Expert Report on Invalidity on July 16, 2010. Because this Court and the Federal Circuit have ruled that Plaintiffs bear the burden of proof on validity, Dr. Beazley's Rebuttal Invalidity Report was improper and untimely. It should be struck in its entirety.

## BACKGROUND AND INTRODUCTION

In this professional-negligence action, Plaintiffs claim injury from alleged negligence of Bereskin & Parr and H. Samuel Frost (collectively, "B&P"). Frost is a patent agent and partner of Bereskin & Parr, a Canadian intellectual-property firm that Touchcom, Inc. hired in 1987 to obtain patent protection for an invention related to gasoline pump dispensers.

In 2003, Touchcom, Inc. and Touchcom Technologies, Inc. sued Dresser, Inc. and Gilbarco, Inc. in the Eastern District of Texas for infringement of the '282 Patent (the "Dresser litigation"). After Gilbarco settled, the court granted summary judgment in favor of Dresser that the patent was invalid because certain software code was missing from the specification. *Touchcom, Inc. v. Dresser, Inc.*, 427 F. Supp. 2d 730, 736–37 (E.D. Tex. 2005).

Plaintiffs now seek to recover damages from B&P, claiming the patent was invalid because of B&P's professional negligence. To recover damages, Plaintiffs must prove that "but for" the alleged negligence, they would have prevailed in the *Dresser* litigation. Thus, as this Court held, they must conduct a "trial within a trial" to prove the '282 Patent would have been found valid and infringed if the software code had been present. *See* Mem. Op. (Feb. 4, 2008), at 12–14 (Dkt. No. 50); *see also Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1413 (Fed. Cir. 2009) (confirming same).

As part of this "trial within a trial" and in accordance with the Joint Discovery Plan entered in this case, the parties exchanged expert disclosures on all issues on which they bear the burden of proof on June 25, 2010. Because Plaintiffs bear the burden of proof on infringement and validity, Plaintiffs' submitted the following technical expert reports:

- Expert Report of Ronald P. Santicola Concerning Infringement (the "Santicola Report"; attached as Ex. A-2); and

- Expert Report of David Beazley, Ph.D. Concerning Claim Construction, Infringement and Validity (the "Beazley Report"; attached as Ex. A-3).

Mr. Santicola later supplemented his infringement opinion on July 14, 2010. *See* Supplemental Expert Report of Ronald P. Santicola Concerning Infringement ("Supplemental Santicola Report"; attached as Ex. A-4). Plaintiffs also filed a Rebuttal Expert Report of David Beazley, Ph.D. Concerning Validity on July 16, 2010 ("Rebuttal Beazley Report"; attached as Ex. A-5). Plaintiffs submitted the Rebuttal Beazley Report on validity despite the fact that they bear the burden of proof on this issue.

After submitting his two expert reports, which include opinions on certain technical issues related to the alleged infringement of the '282 Patent, Mr. Santicola testified in his deposition that he was not an expert in at least the following technical fields:

- communications between different software modules;
- connections between hardware and software;
- computer processing; and
- software architecture.

Deposition of Ronald P. Santicola (July 19, 2010), at 35:17–36:14 ("Santicola dep."; attached as

Ex. A-6). Nevertheless, both the Santicola Report and the Supplemental Santicola Report

include opinions regarding the communications between the various hardware and software

components of the accused systems, as well as the computer processing involved in such

communications. *See* Santicola Report ¶¶ 78–90; Supplemental Santicola Report ¶¶ 71–76, 81–

90.

In forming those opinions, Mr. Santicola did not look at the software code or the technical

details of the accused system. He admits he does not understand some of the technical details

and in one case has "no idea" how the accused system operates from a technical level. Lacking

any technical understanding or analysis, his opinions on these matters are purely conclusory.

Defendants respectfully move that the Court strike these portions of Mr. Santicola's reports as

outside the scope of his expertise and therefore unreliable.

Defendants also request that the Rebuttal Beazley Report be struck in its entirety. Plaintiffs

bear the burden of proof with respect to validity, as the Plaintiffs recognized by submitting the

Beazley Report on June 25, 2010. The Rebuttal Beazley Report is not based on any information

that was not available before the deadline for serving opening expert reports. The Court should

strike the Rebuttal Beazley Report as untimely and improper.

## ARGUMENTS

### A.   Mr. Santicola's Opinions Regarding Message Transmission, Communication, and Processing Should be Struck as Unreliable

Mr. Santicola offers opinions regarding the transmission, communication, and processing

of certain messages in the accused systems. The Court should strike these opinions because they are outside the scope of his expertise.

### 1. Scientific Testimony Must be Reliable

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Acting in their role as gatekeepers, district court judges must "'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc,* 509 U.S. 579, 588 (1993)). The Supreme Court in *Daubert* focused on the "scientific" knowledge requirement of Rule 702 and determined that scientific expert testimony must be derived from scientific method and be supported by appropriate validation. *Id.* at 590. The Court identified certain factors to determine whether the methodology underlying the expert testimony is scientifically valid: (1) whether a theory or technique has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* at 593–94. These factors are neither dispositive nor exclusive. "The primary goal of this inquiry is to ensure that the proffered testimony is reliable, in the sense that it is based on scientific knowledge, and relevant, in the sense that it will be of assistance to the fact-finder." *Sharer v. Tandberg, Inc.*, Case No. 1:06-cv-626, 2007 WL 983849, at *3 (E.D. Va.) (J. Cacheris) (citing *United States v.*

*Barnette*, 211 F.3d 803, 815 (4th Cir. 2000)).

### 2.    Unsupported "Expert" Opinions Should Be Rejected

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Therefore, conclusions that are not based on any scientific knowledge or technical analysis should be excluded.

Likewise, opinions outside the relevant expertise of the proposed expert lack foundation and should be rejected.  In *Sundance, Inc. v. Demonte Fabricating LTD*, the Federal Circuit excluded expert testimony because the expert was unqualified to testify on the issues of patent infringement and invalidity.  550 F.3d 1356, 1364-65 (Fed. Cir. 2008).  The *Sundance* court found the expert was not qualified by knowledge, skill, experience, training, or education and therefore could not assist the trier of fact to understand the evidence or determine a fact in issue. *Id.* at 1362.  Further, the court held that "[a]dmitting testimony from a person such as [the proposed expert], with no skill in the pertinent art, serves only to cause mischief and confuse the fact finder." *Id.*

The Eastern District of Virginia, including this Court, consistently excludes expert opinion testimony when it is outside the expert's area of expertise.  *See Bridgeman v. Deere & Co.*, Civil Action No. 2:07-cv-613, 2009 WL 1344948 (E.D. Va.); *Sharer v. Tandberg, Inc.*, Civil Action No. 1:06-cv-626, 2007 WL 983849 (E.D. Va.) (J. Cacheris); and *Scott v. Mid-Atlantic Cable, Installation, LLC*, Civil Action No. 1:05-cv-970, 2006 WL 2079373 (E.D. Va.) (J. Cacheris).  In *Bridgeman*, the defendants argued that the plaintiff's liability expert was unqualified to offer expert testimony related to design defects on a construction tool known as an excavator.  2009 WL 1344949, at *2.  They pointed out that the expert was not a licensed or registered professional engineer; he had never designed, manufactured, or operated an excavator; and he

had no education, training or experience in construction equipment. *Id.* Additionally, the defendants argued that the expert's background was almost exclusively in the automotive service industry, specifically in the manufacture of aerial lifts, which had nothing to do with the operation of an excavator during demolition work. *Id.* The court excluded the expert's testimony because the expert was not qualified in the relevant field and his opinions merely conclusory. *Id.* at *4.

Similarly, in *Sharer*, this Court excluded testimony from the defendant's expert because he was unqualified. 2007 WL 983849, at *4. The plaintiffs sought to exclude the testimony on the ground that, while he was a qualified expert in the field of economics, his report attempted to introduce medical evidence related to the plaintiffs' memories, which was beyond his expertise. *Id.* The court excluded the evidence and determined that while the witness was a qualified expert in the field of economics and statistics, nothing in his credentials indicated knowledge, skill, experience, training, or education in the field of memory sciences. *Id.*

In *Scott*, this Court again excluded expert testimony because it was outside the scope of the expert's area of expertise. 2006 WL 2079373, at *3. In excluding the proffered testimony the court relied, at least in part, on the expert's admission that she was not an expert in the relevant field. *Id.* ("It is incredulous to argue that the [proposed expert] is an expert ... in light of her unambiguous statements.").

### 3.    Mr. Santicola is Not an Expert in the Field of Invention and His Opinions Are Unreliable

Like the cases cited above, Mr. Santicola offers opinions outside his field of expertise. And like the proposed expert in *Scott*, Mr. Santicola admits he is not an expert in certain technical fields about which he offers "expert" opinions.

Mr. Santicola's experience and knowledge in the field of gasoline dispensers is that of an

operator of the accused systems.  In fact, he testified that his expertise is from an "operational level" and not a technical level.  Santicola dep. at 35: 10-15.  He further clarified "that in terms of technical proficiency, no, I don't know software code, but certainly in terms of — from the operational perspective, I am an expert." *Id.* at 67:15-18.

The field of invention of the '282 Patent, however, involves technical issues about which Mr. Santicola admits he has no expertise:

> Q: Do you agree that the field of invention includes communications between different software modules?
>
> A: Yes.
>
> Q: Are you an expert in that?
>
> A: I am not.
>
> Q: Do you also agree that the field of invention includes connections between hardware and software?
>
> A: Yes.
>
> Q: Are you an expert in that?
>
> A: No.
>
> Q: Do you also agree that the field of invention includes computer processing?
>
> A: Yes.
>
> Q: Are you an expert in that?
>
> A: No.
>
> Q: Do you also agree that the field of invention includes software architecture?
>
> A: Yes.
>
> Q: Are you an expert in that?

A: No.

Santicola dep. at 35:17–36:14. Despite these admissions that he is not an expert on communication and connections between hardware and software, Mr. Santicola offers opinions regarding the "transmission of transaction data" between the pump means and the display and input means, and the "transfer" of input responses from a user to a central processing unit. Santicola Report ¶¶ 78–86; Supplemental Santicola Report ¶¶ 71–76, 81–84. He further offers opinions that the "central processing unit being operable to process the input responses and control the pump means according to the responses," even though he testified he is not an expert in computer processing. Santicola Report ¶¶ 87–90; Supplemental Santicola Report ¶¶ 85–90. Mr. Santicola's opinions on these technical issues are outside the scope of his expertise and should be struck as unreliable expert testimony under Fed. R. Evid. 702 and *Daubert*.

### a. Mr. Santicola's Opinions Regarding the Transfer of Input Responses to the CPU are Unreliable

Mr. Santicola offers opinions that the accused systems "transfer input responses from a user to the central processing unit." Santicola Report ¶¶ 83–86; Supplemental Santicola Report ¶¶ 81–84. These opinions are not based on any scientific knowledge or facts.

Plaintiffs assert that the accused systems infringe claims 1–3 of the '282 Patent. These claims, as well as the patent specification, are very particular regarding the names given to certain messages that are transmitted throughout the system. For example, there is a difference between an "input response" and an "input request." *See* '282 Patent at 1341:20–69. In claim 1, "input responses" are transferred from a user to the central processing unit and further received and processed by the application task means. *Id.* at 1341:34–35, 46–47. In claim 2, however, "input responses" are processed by the display and input task means, while "input requests" are processed by the application task means. *Id.* at 1341:53–59. Thus, there is an important

difference between an "input response" and an "input request." (In fact, the parties devoted large portions of their claim-construction arguments to explaining the differences between these messages.)

Mr. Santicola, however, did not consider the differences between an "input responses" and "input requests" in forming his opinion that "input responses" are transferred from a user to the central processing unit.  When asked why he believes "input resonses," as opposed to "input requests," are sent from the customer-activated-terminal (or "CAT"[1]) to the alleged CPU, he admitted he did not review that issue:

> I'm talking about user responses, you're talking about computer
> instructions, which is really outside of my purview, and I did not review.

Santicola dep. at 177:17–25.  He further admitted that he did not investigate whether the identified input, after being processed by the computer on the accused dispenser, is still an "input response" as opposed to an "input request." *Id.* at 181:10–19 ("I did not.  I considered it a user request.")  He goes so far as to suggest that such an analysis is more of what Dr. Beazley, Plaintiffs' other expert, should have done:

> Q: So you did not review whether or not what is sent from the CAT board
> to the Nucleus CPU is in fact a response or request ---
>
> MR. CHIN: Objection, vague and ---
>
> Q: -- as the patent uses it?
>
> MR. CHIN: Objection, vague and ambiguous, compound.
>
> A: I think that would really be for Dr. Beazley to answer.

Santicola dep. at 178:2–16.

---

[1] Plaintiffs allege that the CAT display on the accused Dresser dispensers is a "display and input means."

Mr. Santicola also fails to provide a basis for how "input responses" are transferred to the CPU. He admits this lack of scientific knowledge: "I do not know technically how the information is transmitted." *Id.* at 174:21–175:10. He further states that he did not analyze what happens to the identified "input response" during any intervening steps but states it "gets transferred in whatever way that happens into the [CPU]." *Id.* at 172:15–19.

Mr. Santicola's opinions, therefore, are not supported by any technical analysis or scientific knowledge. He merely concludes that by observing the operation of a fuel dispenser from an operational level, the technical requirements of the claims must be met. Such conclusory *ipse dixit* does not meet the standards of Fed. R. Evid. 702 or *Daubert*.

**b.    Mr. Santicola's Opinions Regarding the Identification of the Alleged CPU are Not Based on Scientific Fact**

Mr. Santicola's analysis also fails to provide any evidence that the alleged input responses are transferred to "the CPU" required by the asserted claims. Supplemental Santicola Report ¶¶ 81–90. His conclusory opinions are not based on scientific knowledge or any facts in the record and should be struck accordingly.

The asserted claims of the '282 Patent require the use of a single CPU. *See* '282 Patent at 1341:25–48 (Claim 1 requires the input responses to be transferred to "the" CPU). And though the Plaintiffs have alleged that a single processor in the Verifone[2] POS systems is the claimed CPU, Mr. Santicola does not provide any technical analysis to support his conclusion that the identified "input responses" are actually transferred to the identified CPU.

███████████████████████████████████████████████████████

---

[2] Verifone is a third-party provider of point-of-sale systems that interface with the accused fuel dispensers. Plaintiffs allege that the accused Verifone POS systems, in combination with Dresser fuel dispensers, infringe the asserted claims of the '282 Patent. *See, e.g.*, Santicola Report; Supplemental Santicola Report.

███████████████████████████████████████████████

██████████████████████ Yet Mr. Santicola testified that he did not investigate how the

responsibilities between the multiple CPUs were apportioned. *Id.* at 286:6–15. He stated it

"would not be important" to consider which of the multiple CPUs is processing the input

responses because they are all a part of the same "system." *Id.* at 286:16–24; *see also id.* at

287:8–12 ([I]t's really irrelevant from my operator's perspective" as to what CPU receives the

input responses and is controlling the pump in response.).

Because the claims require input responses to be transferred to a single CPU, offering an

opinion on this issue without considering which of the multiple CPUs actually processes the

input responses is not helpful to the trier-of-fact and pure conjecture. Mr. Santicola's opinions

are again not based on any scientific knowledge or technical analysis and should be struck.

      c.    **Mr. Santicola has "No Idea" How Input Responses are Processed on the CPU**

Despite admitting he is not an expert in computer processing, Mr. Santicola offers an

opinion that the central processing unit in the accused systems is "operable to process the input

responses and to control the pump means according to the responses." Santicola Report ¶¶ 87–

90; Supplemental Santicola Report at ¶¶ 85-90. Mr. Santicola offers no technical analysis of

how this happens. He even admits in his deposition that he has "no idea" how it happens:

> Q: How does the central processing unit that you've identified process those input responses?
>
> A: Using the Nucleus software.
>
> Q: And how does it do that?
>
> A: I have no idea. I don't know how Microsoft Windows works either,

---

[3] All embodiments of the accused Topaz system utilize a separate Sapphire computer, and some embodiments of the Ruby system utilize a separate Sapphire computer. Santicola dep. at 284:7–285:24.

but I use it every day.

Santicola dep. at 187:25–188:8.  He further admits that he did not look at the software running on the CPU to determine what processing is done.  *Id.* at 201:4–7.

Again, Mr. Santicola reviewed the accused systems from an operational level and did not even confirm that the "input responses" he identified were actually used by the CPU to control the pump means, as required by the claims:

> Q:  Did you look at the software running on the CPU to determine if the actual input responses that you've identified in element seven are actually used to create the pump control?
>
> MR. CHIN:  Objection, vague and ambiguous, and beyond the scope of Mr. Santicola's report.
>
> A:  I have not examined the software at all.
>
> Q:  You just looked at it from an operational view?
>
> A:  The operator's point of – perspective and customer's point of perspective, yes.

Santicola dep. at 192:23–193:13.[4]  This lack of analysis in formulating an opinion regarding the technical requirements of the claims does not pass muster.  Mr. Santicola's opinions on this technical requirement of the claims should be struck as unreliable.

### d.    Mr. Santicola's Opinions Regarding the Transmission of Transaction Data are Not Supported by Any Technical Analysis

Mr. Santicola also offers an opinion that the accused systems include a pump means that is "operable to transmit transaction data . . . to the display and input means."  Santicola Report ¶¶ 78–82; Supplemental Santicola Report ¶¶ 71–76.  His entire analysis is based on a review of an

---

[4] As is evident from the objection in the quotation above, counsel for Plaintiffs even admits that a technical analysis of whether the input responses identified by Mr. Santicola were actually processed by the CPU was not addressed by Mr. Santicola in his reports.

operation manual indicating that certain messages and status indicators appear on display devices in response to certain customer action at the dispenser. Santicola Report ¶ 80; Supplemental Santicola Report ¶¶ 72–74.

For example, in his initial report, Mr. Santicola cites to a table from a Dresser manual, reproduced below, as evidence that the pump means transmits transaction data to the display and input means.



---

[5] Defendants contest whether such instructional displays are "transaction data." *See*

Mr. Santicola does not, however, describe how the CAT-Display messages are allegedly transmitted from the "pump means." *See id.* ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

Similar to his opinions regarding the transfer of input responses to a CPU, moreover, Mr. Santicola provides no analysis of how the alleged "transaction data" is transmitted and fails to appreciate the technical details required to understand whether the accused systems practice this element of the claims. When asked in his deposition how the "transaction data" was transmitted from the pump means to the display and input means, he responded "[w]ell, on wires, yeah — I mean, yes, I understand that basically, yes." Santicola dep. 118:19–23; *see also id.* at 122:7–11 ("Just — just wiring and — regular connections."). Undertaking only this type of rudimentary analysis is not helpful to the trier-of-fact.

Mr. Santicola further did not know what type of communication protocol was used to transmit the data between the different parts of the accused system and did not consider whether incompatible communication protocols would effect such a transmission. *Id.* at 124:3–13.

Likewise, although Mr. Santicola admits that the "transaction data" is processed and transmitted between different components of the accused system, he did not consider this in his analysis or try to understand how those intermediate processes work on a technical level. █

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Defendants' Motion for Summary Judgment (Dkt. No.150).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ Mr. Santicola finally admits that "I do not

understand technically" how the messages from the pump are processed and translated.
Santicola dep. at 121:5–20.

Although not knowing technically how "transaction data" is processed and transmitted, he
concludes that the data is transferred to the display and input means because he "knows the flow
of the information through the diagram." *Id.* at 121:19–20.

Mr. Santicola's opinions regarding the transmission of transaction data is outside the field
of his expertise and not based on any scientific knowledge. Just because he supposedly "knows
the flow of the information through the diagram" does not render him capable of offering
technical expert testimony regarding the transmission of information through a highly-
specialized computer system. His testimony in this regard is unreliable and will not assist the
jury in understanding the technical issues involved.

Similar to the experts in *Sundance, Bridgeman, Sharer*, and *Scott*, Mr. Santicola's reports
include opinions that are beyond his expertise. Just as the Federal Circuit stated in *Sundance*,
admitting testimony from a person such as Mr. Santicola, with no skill in the pertinent art, is
likely to cause mischief and confuse the fact finder. 550 F.3d at 1362. Mr. Santicola's reports
are admittedly based on his analysis of the accused systems from a operator's point of view. He
did not analyze how the accused systems work from a technical level and in some cases does not

– 17 –

understand the technical details and has "no idea" how the CPU operates to perform the operations on which he opines. Without any technical analysis or understanding, Mr. Santicola concludes that the claim limitations identified above are met. These limitations, however, involve technical details of communications between hardware and software and the processing of messages by a CPU. Since Mr. Santicola admits he is not an expert in these fields of invention, the Court should strike paragraphs 78–90 of the Santicola Report and paragraphs 71–76 and 81–90 of the Supplemental Santicola Report.

**B.    Dr. Beazley's Rebuttal Expert Report is Untimely and Improper**

According to this Court and the Federal Circuit, Plaintiffs have the burden of proving "but for" causation. Accordingly, they must prove the '282 patent was not invalid. *See Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1413 (Fed. Cir. 2009) ("Touchcom will be required to show that, had appellees not omitted a portion of the source code from its application, the resulting U.S. patent would not have been held invalid."); Mem. Op. (Feb. 4, 2008), at 12-14 (Dkt. No. 50) ("Plaintiffs must show that their patent application was otherwise valid, rendering proof of patent validity a 'necessary element' of Plaintiffs' malpractice claim."). The requirement that Plaintiffs bear the burden on validity is the law of the case. *U.S. v. Agyepong*, Case No. 09-4643, 2010 WL 2852653, at *3 (4th Cir. July 21, 2010) ("Generally, 'the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)).

Realizing they bear the burden of proof on validity, Plaintiffs submitted the opening Beazley Report on June 25, 2010 in accordance with the Joint Discovery Plan. Plaintiffs,

however, also submitted the Rebuttal Beazley Report[6] on July 16, 2010. The Rebuttal Beazley Report is not based on any facts that were not known to the Plaintiffs when they submitted their opening report on validity. The Federal Rules and Local Rules outline the timing and sufficiency requirements for expert disclosures. Plaintiffs should not be allowed to take a second bite at the apple after they realize their initial disclosure was not sufficient. The Rebuttal Beazley Report is untimely and improper under the Rules and the law of the case and should therefore be struck in its entirety.

CONCLUSION

For each of the reasons argued above, Defendants respectfully request that paragraphs 78–90 of the Santicola Report and paragraphs 71–76 and 81–90 of the Supplemental Santicola Report be struck as unreliable expert testimony under Federal Rule of Evidence 702 and *Daubert*. Defendants further request that the Rebuttal Beazley Report be struck in its entirety as being untimely and improper under the Rules and the law of the case.

---

[6] Because Plaintiffs have denied throughout discovery that they bear the burden on validity Defendants submitted an opening expert report on invalidity on June 25, 2010. *See, e.g.*, Letter from M. Bhattacharyya to M. Harper, dated May 20, 2010 (attached as Ex. A-9)).

Dated:  September 2, 2010

Respectfully submitted,

/s/ Monplaisir G. Hamilton
Monplaisir G. Hamilton
   Virginia Bar No. 76005
Peter E. Strand (*pro hac vice*)
   D.C. Bar No. 481870

SHOOK, HARDY & BACON L.L.P.
1155 F Street, N.W., Suite 200
Washington, D.C. 20004
202-783-8400 – Telephone
202-783-4211 – Facsimile

and

John H. Martin (*pro hac vice*)
   Texas State Bar No. 13086500
J. Michael Heinlen (*pro hac vice*)
   Texas State Bar No. 24032287

THOMPSON & KNIGHT L.L.P.
1722 Routh Street, Suite 1500
Dallas, Texas 75201
214-969-1700 – Telephone
214-969-1751 – Facsimile

ATTORNEYS FOR DEFENDANTS
BERESKIN & PARR AND H. SAM FROST

## CERTIFICATE OF CONFERENCE

I certify that on September 2, 2010, counsel for Defendants conferred with counsel for Plaintiffs in a good-faith effort to resolve the disputes presented in this motion. Counsel for Plaintiffs stated that they are opposed to all the relief sought in this motion.

/s/ Monplaisir G. Hamilton
Monplaisir G. Hamilton

## CERTIFICATE OF SERVICE

I certify that on September 2, 2010, I served the foregoing document by electronic mail and first-class mail on the following counsel for Touchcom:

Daniel Donohoe Prichard
DOW LOHNES & ALBERTSON PLLC
1200 New Hampshire Ave. NW, Suite 800
Washington, D.C. 20036

Michael S. Shuster
Sheron Korpus
Alycia Regan Benenati
KASOWITZ BENSON TORRES & FRIEDMAN L.L.P.
1633 Broadway
New York, NY 10019

/s/ Monplaisir G. Hamilton
Monplaisir G. Hamilton