IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

TOUCHCOM, INC., *et al.*,          )
                                   )
    Plaintiffs,          )
                                   )
       v.          )
                                   )    1:07cv114 (JCC)
BERESKIN & PARR, *et al.*,          )
                                   )
    Defendants.          )


**M E M O R A N D U M   O P I N I O N**

    This matter comes before the Court on Defendants
Bereskin & Parr and H. Samuel Frost's Motion for Summary
Judgment ("MSJ"). [Dkt. 150.] For the reasons stated below,
the Court will grant in part and deny in part this motion.

**I.   Background**

    In 1987, plaintiff Touchcom, Inc. ("TI") hired
defendants Bereskin & Parr ("B&P") and H. Samuel Frost (a
partner at B&P) (collectively "Defendants") to obtain patent
protection for an invention related to gasoline pumps (the
"Invention"). After obtaining a Canadian Patent, Defendants
filed an application under the Patent Cooperation Treaty
("PCT"), resulting in the issuance of United States Patent No.
5,027,282 (the "'282 Patent") in 1991. (MSJ Ex. B-1.)
Plaintiff Touchcom Technologies, Inc. ("TTI") was incorporated

1

on June 13, 1989.  (MSJ at 3 ¶ 3).  In 2003, TI and TTI

(collectively "Plaintiffs") sued Dresser, Inc., in the Eastern

District of Texas for infringement of the '282 Patent (the

"Dresser Litigation").  The court in that action granted summary

judgment, finding the '282 Patent was invalid because certain

software code was missing from the specification.  *Touchcom,*

*Inc. v. Dresser, Inc.*, 427 F. Supp. 2d 730, 736–37 (E.D. Tex.

2005).  Plaintiffs are suing Defendants for malpractice arising

out of that action.

Defendants filed their Motion for Summary Judgment on

August 11, 2010.  [Dkt. 150.]  Plaintiffs filed a Memorandum in

Opposition ("Opp.") on August 25, 2010.  [Dkt. 161.]  And

Defendants filed a Reply in Support of their Motion for Summary

Judgment ("Reply.") on August 30, 2010.  [Dkt. 162.]  Following

oral argument before this Court on September 3, 2010, this Court

took the Motion for Summary Judgment under advisement and

elected to hold a hearing on the issue of "ensnarement," which

was held on November 22, 2010.  The parties then submitted

proposed findings of fact and conclusions of law [Dkts. 215

(Defendants' Proposed Findings of Fact ("D. FoF")), 216

(Defendants' Proposed Conclusions of Law ("D. CoL.")), 217

(Plaintiffs' Proposed Findings of Fact and Conclusions of Law

("P. FoF"))], as well as briefs in opposition [Dkts. 218

(Plaintiffs' Response ("P. Resp.")), 219 (Defendants' Response
("D. Resp."))].

Defendants make four general arguments in support of
summary judgment: (1) that Plaintiff's claims are time-barred;
(2) that the allegedly infringing Dresser systems do not in fact
infringe; (3) that TTI was never a B&P client and therefore has
no standing to sue B&P; and (4) that TI did not suffer an injury
and lacks standing to sue Defendants.[1]  (MSJ at 1-2.)  Defendants
submitted "undisputed" facts in support of these arguments, most
of which Plaintiffs in fact dispute.  This Court will therefore
proceed to the substance of Defendants' arguments and will
address disputed facts as the need arises.

## II.  Standard of Review

Summary judgment is appropriate only if the record
shows that "there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a matter
of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps.
& Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations
omitted).  The party seeking summary judgment has the initial
burden of showing the absence of a material fact.  *Celotex Corp.
v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of
material fact exists "if the evidence is such that a reasonable

---

[1] Defendants withdrew a fifth argument regarding patent misuse on September 1,
2010.  [Dkt. 164.]

3

jury could return a verdict for the non-moving party."
*Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The party opposing summary judgment may not rest upon mere allegations or denials. Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quotation omitted).

Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986). Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

## III. Analysis

### A. Statute of Limitations

Defendants argue first that their patent work for Plaintiffs ended more than three years before Plaintiffs filed suit in this case, thus barring suit under Virginia's three-year statute of limitations for oral contract claims. *See* Va. Code Ann. § 8.01-246(1). Defendants claim that they were retained for a series of separate tasks that ended with the issuance of the '282 Patent, as opposed to being retained generally. (MSJ at 6-11.) Defendants further argue that Plaintiff's were injured, if at all, in 1991, when Defendants secured the '282 Patent (as opposed to when the Dresser Litigation found the Patent invalid). (MSJ at 11-13.)

#### i. D&P's Scope of Retention

Defendants argue that, as a general matter, their pursuit of the '282 Patent "was one of a series of separate engagements for securing foreign patents." (MSJ at 7.) The implication of this is that Defendants did not continuously represent Plaintiffs up to and through the Dresser Litigation. This Court is not convinced.

Defendants first cite deposition testimony of Peter Hollidge, President of TI and TTI, arguing that Hollidge had "no knowledge of the terms of the oral contract that B&P allegedly breached" and that Hollidge instead simply retained B&P to

5

procure a Canadian patent.  (MSJ at 7.)  It is unclear whether Hollidge's deposition testimony supports such a reading. Holledge appears to testify instead that Petro-Canada (part owner of TI) originally asked B&P to perform legal services for TI and that Hollidge was unsure what precisely *Petro-Canada* asked of B&P.  Hollidge Dep. at 205:7-16.  Whatever Petro-Canada asked of B&P, neither Plaintiffs nor Defendants argue that Petro-Canada's request constituted the "oral contract" at issue in this case.  Defendants therefore fail to show that Hollidge actually had no knowledge of the terms of B&P's oral contract with TI.

Defendants secondly note that when Hollidge decided to file a PCT application and engaged B&P for the task, B&P opened separate files and invoiced separately for each application, and kept separate files and invoiced separately for each patent. (MSJ at 7-8.)  Defendants claim this shows those services having been rendered subject to new and independent agreements.  *Id.* But the existence of separate files and separate invoices for separate patents hardly *proves* that each patent was governed by its own separate contract.

Defendants additionally note that TI retained other law firms on matters relating to the '282 Patent.  (MSJ at 9.) But while that may show that the Parties did not maintain an *exclusive* relationship with respect to the '282 Patent, this

hardly proves that *no* relationship continued between the Parties past B&P's procurement of the patent.

A closer call, however, is Hollidge's sworn declaration in the underlying *Dresser* matter, in which he stated that

> Mr. Sam Frost, of the law firm of Bereskin and Parr, has not provided Touchcom or Touchcom Technologies with any counseling or substantive legal work for many years. The extent of our use of Sam Frost in recent years has been to retrieve documents associated with recent court actions.

(Decl. of Peter Hollidge (June 8, 2005) ¶ 4.) Defendants claim that this statement judicially estoppes Plaintiffs from arguing that the Parties were engaged in a continuous representation. (MSJ at 9-10.)

The elements of judicial estoppel are as follows:

> First, the party sought to be estopped must be seeking to adopt a [fact] position that is inconsistent with a stance taken in prior litigation. . . . Second, the prior inconsistent position must have been accepted by the court. Lastly, the party against whom judicial estoppel is to be applied must have intentionally misled the court to gain unfair advantage. This bad faith requirement is the determinative factor.

*Whitten v. Fred's, Inc.*, 601 F.3d 231, 241 (4th Cir. 2010). Based on the information before this Court, the analysis can stop at step one. It is unclear to what degree Hollidge's statement is inconsistent with continuous representation. It is

possible, for instance, that a single representation could include both the procurement of a patent--a substantively significant task--and the maintenance of the patent--a substantively less significant task. Even if the more difficult work was completed, the fact that any work was continuing suggests that some relationship remained. This Court will leave the significance of that relationship to the jury.

Defendants further argue, citing *Virginia Military Institute v. King*, 217 Va. 751 (1977) ("*V.M.I.*"), that Defendants' patent maintenance activities did not "continue" Defendants' representation of Plaintiffs with respect to the '282 Patent. In *V.M.I.*, the plaintiff brought suit against an architectural firm for damages to a building. The cause of action in that case accrued against the architects for improper design when the plans for the building were approved. 217 Va. at 759. Rejecting the plaintiff's continuous representation argument, the Court found that the design and supervision of construction of the building were separate undertakings. *Id.* at 761. The difference in *V.M.I.*, however, is that the line between design and supervision was clearly drawn and set forth in a *written* contract, whereas the oral contract in this case was far more amorphous and did not obviously distinguish between patent procurement and maintenance. *See, e.g.*, Hollidge Dep. at 206:19-20 ("I think the arrangement between ourselves and

Bereskin & Parr simply evolved."). Because it remains unclear exactly what the scope of Defendants' agreed-upon representation was, this Court will not grant summary judgment on this basis.

### ii. Time of Alleged Breach

Defendants next argue that, to the extent it breached its contract with Plaintiff, the breach occurred when it procured the '282 Patent (June 25, 1991). (MSJ at 11-14.) Plaintiffs counter that their injury occurred in 2005, within the limitations period, when *Dresser* invalidated the patent. (Opp. at 12-14.)

In support of their argument, Defendants cite the general rule that limitations periods accrue when a breach of contract occurs, as opposed to when damage is discovered. (MSJ at 11.) Yet Virginia law addresses accrual of *attorney malpractice* claims more specifically:

> [W]hen malpractice is claimed to have occurred during the representation of a client by an attorney with respect to a particular undertaking or transaction, *the breach of contract or duty occurs and the statute of limitations begins to run when the attorney's services rendered in connection with that particular undertaking or transaction have terminated*, notwithstanding the continuation of a general attorney-client relationship, and irrespective of the attorney's work on other undertakings or transactions for the same client.

*Keller v. Denny*, 232 Va. 512, 517-18 (1987) (emphasis added). Defendants would argue, of course, that the "particular

9

undertaking" involved in this case was the procurement of the '282 Patent, whereas Plaintiffs would argue that the procurement of that patent was merely part of a larger undertaking or took place in the context of a general attorney-client relationship. As explained in the prior section, this Court finds insufficient evidence to rule that the Plaintiffs' particular undertaking ended with the procurement of the '282 Patent.

Moreover, Defendants do not address the unusual circumstance presented by their alleged moment-of-breach: that no injury or damages appear to have existed at that time (because no one questioned the validity of the patent before the *Dresser* action). That is different from the cases Defendants cite. In *Shipman v. Kruck*, 267 Va. 495, 503-04, 504 n.5 (Va. 2004), the plaintiffs were found to have incurred an injury at the time they filed for bankruptcy *because* doing so resulted in immediate injuries, including lost control over assets, lost protection from creditors, a damaged credit rating, and other costs. In *MacLellan v. Throckmorton*, 235 Va. 341, 345 (1988), the Court, applying *Keller*, found that the parties' particular undertaking ended when the court handed down a final decree that included an improper alimony agreement. And in *Harbour Gate Owners' Association v. Berg*, 232 Va. 98, 256-58 (1986), the building at issue was already damaged before the conveyance of defective deeds.

Here, unlike in these cases, Defendants fail to explain what, if any, injury the Plaintiffs suffered at the time the patent was awarded. Without such an injury to point to, the limitations period could not have begun to accrue at that time.[2] This Court will therefore deny Defendants' motion with respect to this claim.

B. Infringement

To prove legal malpractice at trial, Plaintiffs must show that, but for Defendants' negligence, they would have prevailed in their infringement suit against Dresser. *Stewart v. Hall*, 770 F.2d 1267, 1270 (4th Cir. 1985). Defendants argue that, had the '282 Patent survived the Dresser Litigation, the Dresser device still would not have infringed upon it neither literally nor under the doctrine of equivalents.

i. Literal Infringement

"Literal infringement requires that the accused device contain each limitation of the claim exactly." *Applied Material, Inc. v. Tokyo Seimitsu, Co.*, 446 F. Supp. 2d 538, 543 (E.D. Va. 2006). "Any deviation from the claim precludes a finding of literal infringement." *Litton Sys., Inc., v. Honeywell Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998). It is

---

[2] Plaintiffs also raise the constitutional argument that loss of a right to sue before accrual of that right would violate the Due Process Clause. (Opp. at 15.) Courts have recognized this concern, *see, e.g.*, *MacLellan*, 367 S.E.2d at 722. But because we are not granting summary judgment with respect to the limitations claim, we will not reach the constitutional issue. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341 (1936).

generally an issue of fact for a jury to decide. *TDM America,*
*LLC v. United States*, 92 Fed. Cl. 761, 768 (Fed. Cl. 2010).
Summary judgment is permissible, however, where "on the correct
claim construction, no reasonable jury could have found
infringement on the disputed facts or when all reasonable
factual inferences are drawn in favor of the parties." *Id.*
(citing *TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1371
(Fed. Cir. 2002)); *Steigleder v. Eberhard Faber Pencil Co.*, 176
F.2d 604, 604-05 (1st Cir. 1949) ("Where it is apparent that
there is no genuine issue of fact bearing on infringement, and
the structure and mode of operation of the accused device are
such that they may be readily comprehended by the court, and
compared with the invention described and claimed in the patent,
without the need of technical explanation by the testimony of
expert witnesses, then the court, if satisfied that there is no
infringement, should give summary judgment for the defendant,
instead of subjecting the parties to the expense of a trial.").

The systems at issue in *Dresser* consisted of two
structures relevant to this matter, a Computer Activated
Terminal (the "CAT") and a Sales Display.  Defendants argue that
the CAT does not infringe Claim 1 of the '282 Patent because
Claim 1 requires a "display and input means" showing
"transaction data, concerning fuel pumped," whereas the CAT only
displays instructions, not transaction data concerning fuel

pumped.  (MSJ at 14-15.)  The parties agree that "transaction data," as stated in Claim 1, means "information about an ongoing or completed transaction."  (MSJ at 15; Opp. at 16.)

Defendants argue that this definition limits transaction data to volume and price information, and argue that the CAT instead displays instructions to the customer about how to proceed with a transaction.  (MSJ at 15-18.)  The Court disagrees with Defendants' limited definition of transaction data, but agrees with the overall thrust of Defendants' argument as to literal infringement.

A simple look at Figure 15 from the '282 Patent, which both parties cite, shows transaction data including more than just volume and price information.



FIG.15

The patent defines Element 1503 (shown above) as displaying "transaction data."  '282 Patent at 28:32-34; 29:29-32.  And

13

Element 1503 displays information besides price and volume data: the type of credit card used. Moreover, information as to fuel *price* options (regular, unleaded, and super unleaded) appears to fall *outside* of Element 1503 on the diagram. Thus, it is difficult to agree with Defendants that the diagram limits "transaction data" to price and volume information.

Still, even without defining "transaction data, concerning fuel pumped," as being *limited* to volume and price information (as Defendants argue), that hardly means that transaction data does not *include* volume and price information, or that a display can *omit* such information and still infringe the '282 Patent. Indeed, the '282 Patent itself lists a number of items as "transaction data," including PPU (price per unit), volume (in gallons or liters), and sales (prices). '282 Patent at 7:65-8:16. None of this information appears to be displayed on the CAT.

Rather, the messages Plaintiffs' expert identifies as "transaction data" are

> a. "BEGIN FUELING"
>
> b. "REPLACE NOZZLE WHEN FINISHED"
>
> c. "RECEIPT? YES OR NO?"

(Opp. at 17.) They are similar, and in the last case identical, to messages Plaintiffs' expert termed "instruction displays," including

a. "REMOVE CARD QUICKLY"

b. "ONE MOMENT PLEASE"

c. "REMOVE NOZZLE LIFT LEVER"

d. "REPLACE NOZZLE WHEN FINISHED"

(*See* MSJ at 17.)  To the extent these messages convey transaction data concerning fluid pumped at all, no reasonable juror could find that they convey anything approximating the transaction data listed in the '282 Patent.

Moreover, the '282 Patent treats instruction displays separately from transaction data.  It states, "wherein the pump means is operable to transmit transaction data, concerning fluid pumped, to the display and input means which will *display the transaction data, display one instruction display*, and transfer input responses from a user . . . ."  '282 Patent at 1341:30-34 (emphasis added).  This language differentiates between the display of transaction data and the instruction display.  And between those two categories, the CAT's messages fall well on the informational side.

Thus, because no reasonable juror could find that the CAT displays "transaction data, concerning fluid pumped" as described in the '282 Patent, this Court finds that the Dresser device did not literally infringe the '282 Patent.

## ii. <u>Infringement under the Doctrine of Equivalents</u>

Under the Doctrine of Equivalents, the question remains whether the combination of the CAT and Dresser's separate Sales Display infringes the '282 Patent. That doctrine holds that "[e]ven if outside the literal meaning of the claims, an accused process or device can still be found to infringe . . . if it is the substantial equivalent of the patented invention." *TDM America*, 92 Fed. Cl. at 768. "When two elements of the accused device perform the same function as a single element of the patented invention . . . the doctrine of equivalents may still apply if the differences are insubstantial." *Eagle Comtronics, Inc. v. Arrow Commc'n Labs.*, 305 F.3d 1303, 1317 (Fed. Cir. 2002).

Defendants argue that Plaintiffs should be precluded from invoking the doctrine of equivalents because the combined Dresser system would encompass, or "ensnare," the prior art. (MSJ at 19-21.) Ensnarement is a legal limitation on the doctrine of equivalents. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1323 (Fed. Cir. 2009). And ensnarement is a question of law that must be decided by a Court, not a jury. *Id.*

The burden in an ensnarement case begins with the alleged infringer (here, Defendants stand in this role), who must come forward with evidence of prior art that ensnares the

proposed range of equivalents. *Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 983 (Fed. Cir. 1999). After Defendants present the allegedly ensnaring prior art, the burden falls upon the patentee (Plaintiffs in this case) to establish that the asserted equivalency would not ensnare the prior art, with the district court permitted to consider expert testimony and other extrinsic evidence. *DePuy Spine*, 567 F.3d at 1323.

After the defense has met its burden of coming forward with prior art, a useful method for analyzing ensnarement is with a hypothetical claim that literally covers the allegedly equivalent product. *Id.* at 1324. If, given the state of the prior art, the hypothetical claim would be unpatentable due to either *anticipation* (*see* 35 U.S.C. § 102), or *obviousness* (*see* 35 U.S.C. § 103) under the prior art, then the accused device will be held noninfringing as a matter of law. *Id.* at 1325.

This Court thus begins its ensnarement analysis with Defendants' burden to come forward with prior art.

### a. Defendants' Burden of Presenting Prior Art

The central pillar of Defendants' prior-art arguments is commonly referred to by the parties as the "ARCO II Report" or the "ARCO II Reference" or "ARCO II System." (P. FoF ¶ 175; D. CoL ¶¶ 24-28.) Defendants contend that the ARCO II Report, when read together with a series of patents, constitutes prior art that renders the Hypothetical Claim anticipated or obvious.

(D. CoL ¶¶ 24-28.)  Plaintiffs object, however, to the *timing* of Defendants' disclosure of ARCO II as prior art, arguing that Defendants' failure to raise ARCO II or any of the related patents in Defendants' Motion for Summary Judgment should preclude Defendants from relying on them as prior art.

"Typically, courts will not consider an argument raised for the first time in a reply brief." *Chang-Williams v. Dep't of the Navy*, --- F. Supp. 2d ---, 2011 WL 345904, at *13 n.16 (D. Md. Feb. 2, 2011) (citations omitted).  Yet "the power to decline consideration of such arguments is discretionary, and courts are not precluded from considering such issues in appropriate circumstances." *Clawson v. FedEx Ground Package System, Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (citations omitted).  And, importantly, the primary reason for declining such consideration is where the opposing party is prejudiced in its ability to respond to the argument.  *Id.* at 735.

Here, Defendants first came forward with alleged prior art in their Motion for Summary Judgment, which cited the "Background of the Invention" section of the '282 Patent in claiming that "[t]he prior art electronic dispenses also had card and note readers that could accept prepayment, and Plaintiffs [*sic*] experts do not dispute that the card readers also included a display that provided instructions to the customer."  (MSJ at 20.)  It was only in Defendants' Reply in

Support of Summary Judgment that Defendants cited to their expert's "Invalidity Report," which contained "six detailed claim charts, each describing how the prior art practices every limitation of the '282 Patent," and argued that since Plaintiffs were on notice of those claims because they "received copies of that report over two months ago."

Under some circumstances, Defendants' disclosure might have been inadequate. But because *prejudice* is the touchstone for declining to hear an argument first raised in a reply, those circumstances are not found here. As the parties are more than aware, the relevant briefing on this matter continued well beyond the initial summary judgment motions, and both sides have been afforded--and have taken--every opportunity to fully develop their positions with respect to Defendants' alleged prior art. Plaintiffs therefore did not incur sufficient prejudice to warrant preclusion of Defendants' prior art allegations.

Thus, this Court will consider Defendants' alleged prior art combinations, as listed below.

As evidence of anticipation:

- The ARCO II Report (D. CoL ¶¶ 25, 26) + United States Patent No. 3,931,497 (the "497 Patent" or the "Gentile Patent)

- United States Patent No. 4,107,777 (the "'777 Patent") (D. CoL ¶ 27)

As evidence of obviousness:

- The ARCO II Report + the '777 Patent + United States Patent No. 4,395,627 (the "'627 Patent") + United States Patent No. 4,630,754 (the "'754 Patent") (D. CoL ¶ 28)[3]

*b. Hypothetical Claim Construction*

Touchcom asserts infringement under the doctrine of equivalents of Claims 1, 2, and 3 of the '282 Patent. Thus, a relevant hypothetical set of claims, separated into individual elements, for the purposes of an ensnarement analysis, would appear as follows (with an underline indicating an addition to the '282 Patent's original claim language, and a strike-through indicating a deletion from that language):

HYPOTHETICAL CLAIM ONE

An interactive pump system capable of interacting with and responding to responses from a user, the system comprising;

a pump means;

a central processing unit connected to the pump means; and

a display and input means including a plurality of instruction displays, and being connected to the pump means and the central processing unit;

---

[3] Defendants also submit two other patent combinations in support of obviousness, including the '777 and '627 Patents, and the '777, '627, and '754 Patents. (D. CoL ¶¶ 29, 30.) Yet because these Patents are all included in Defendants' first obviousness claim, its second two claims appear unnecessary. *See In re Zweiman*, 25 F. App'x 937, 940 (Fed. Cir. 2001) ("It is not necessary in an obviousness rejection that all the limitations of an applicant's claim appear in a single reference.").

> <u>a transaction data display connected to the</u>
> <u>pump means</u>;
>
> wherein the pump means is operable to
> transmit transaction data,
> concerning fluid pumped, to the <u>transaction</u>
> <u>data display which will display the</u>
> <u>transaction data, and the</u> display and input
> means ~~which~~ will ~~display the transaction~~
> ~~data~~, display one instruction display, and
> transfer input responses from a user to the
> central processing unit,
>
> the central processing unit being operable
> to process the input responses and to
> control the pump means according to the
> responses,
>
> characterized in that the central
> processing unit includes pump task
> means, display and input task means and
> application task means, each task means, in
> operation running concurrently with the
> other task means, with the pump task means
> controlling the pump means, the display and
> input task means controlling the display
> and input means, and the application task
> means receiving and processing the input
> responses and transferring results into
> pump directions to the pump task means.

The final paragraph, commonly referred to as "Element 8," is the

only one at issue with respect to ensnarement.[4]

Along with Element 8 of Claim 1, the instant dispute

regarding ensnarement involves Claims 2 and 3 of the '282

---

[4] Defendants allege that Plaintiffs attempted, in their Proposed Findings of
Fact 93-95, to argue that Elements 1-7 of Claim 1 are not ensnared. [D.
Resp. 4 n.9.] Having reviewed the relevant paragraphs, this Court reads
those paragraphs differently, as simply arguing that the '282 Patent's
language regarding prior art does not prove ensnarement. Regardless,
Plaintiffs limited their argument at the Ensnarement Hearing to Element 8,
and this Court consider the parties' dispute under Claim 1 as limited to
Element 8. *See* Ensnarement Hr'g Tr. at 281:14-283:25.

Patent.  Both claims are on Claim 1.  Accordingly, Hypothetical

Claims 2 and 3 are dependent on Hypothetical Claim 1 as well.

HYPOTHETICAL CLAIM 2

> The system of claim 1, wherein the pump
> task means is arranged, in controlling the
> pump means, to process the pump directions
> and transfer pump commands to, and receive
> pump responses from, the pump means; the
> display and input task means being
> arranged, in controlling the display and
> input means, to transfer displays and input
> commands to, and receive display responses
> and input responses from, the display and
> input means, process the display and input
> responses and transfer resultant display
> and input requests to the application task
> means, and the application task means is
> arranged to process the display and input
> requests and transfer resultant pump
> direction to the pump task means.

HYPOTHETICAL CLAIM 3

> The system of claim 2, wherein the pump
> task means additionally is arranged to
> process the pump responses and transfer
> resultant pump requests to the application
> task means, the application task means
> additionally being arranged to process the
> pump requests and transfer resultant
> display and input directions to the display
> and input task means, which process the
> display and input directions.

Moreover, it is important to note that prior to the

Ensnarement Hearing, this Court adopted, or the parties agreed

upon, additional constructions for certain terms within these

claims.

| Claim Term | Agreed-Upon Construction |
|---|---|
| central processing unit | No construction necessary; plain meaning |
| running concurrently | Executing multiple tasks at the same time in a single central processing unit |
| Task | A software module separately controlled by a multitasking operating system |
| transaction data | Information about an ongoing or completed transaction |

The parties further agreed on constructions of corresponding structures for the various "task means" as they appear in claims 1-3 of the '282 Patent, including the "Pump Task Means," "Application Task Means," and "Display and Input Task Means." [Dkt. 153 at 3 n.1.]

"Pump Task Means" Construction

| Claim | Function | Corresponding Structure |
|---|---|---|
| 1 | "control the pump means" | an algorithm (and equivalents) that selects a pump command code, creates a control message that includes the command code, and writes the control message on the connection between the CPU and the pump. |
| 2 | "process the pump directions and transfer pump commands to, and receive pump responses from, the pump means" | an algorithm (and equivalents) that inspects the pump direction to select a procedure to execute and then, in the chosen procedure, selects a pump command code, creates a control message that includes the command code, writes the control message on the connection between the CPU and the pump, and reads the pump response on the connection between the CPU and the pump. |
| 3 | "process the pump responses and transfer resultant pump requests to the application task means" | an algorithm (and equivalents) that inspects the pump response data, creates a pump event message, and transfers the message to an event queue for later use by the application task. |

## "Application Task Means" Construction

| Claim | Function | Corresponding Structure |
|---|---|---|
| 1 | "receive and process the input responses and transfer the results into pump directions to the pump task means" | an algorithm (and equivalents) that waits for a user input, receives and inspects an input response, validates the sale, creates a pump direction message, and sends the message to the pump task means |
| 2 | "process the display and input requests and transfer resultant pump directions to the pump task means" | an algorithm (and equivalents) that inspects the received display and input request, validates the sale, creates a pump direction message, and sends the message to the pump task means |
| 3 | "process the pump requests and transfer resultant display and input directions to the display and input task means" | an algorithm (and equivalents) that inspects the received pump request, selects a display and input operation, creates a display and input direction, and sends the message to the display and input task means |

"Display and Input Task Means" Construction

| Claim | Function | Corresponding Structure |
|---|---|---|
| 1 | "control the display and input means" | an algorithm (and equivalents) that selects a display and input means command code, creates a control message that contains the command code, and writes the control message on the connection between the CPU and the display and input means alternate: an algorithm (and equivalents) that identifies data to be shown, and executes an operation to have the data transferred to the display and input means |
| 2 | "transfer displays and input commands to, and receive display responses and input responses from, the display and input means, process the display and input responses, and transfer resultant display and input requests to the application task means" | "transfer": an algorithm (and equivalents) that inspects the command type and selects a procedure to execute, within the selected procedure selects a display and input means responses and input responses from, the display and input means, process the display and input responses, and transfer resultant display and input requests to the application task means" command code, creates a control message that contains the command code, and writes the control message on the connection between the CPU and the display and input means.<br><br>"receive," "process," and "transfer": an algorithm (and equivalents) that reads response data from the display and input means, inspects the response, creates an event message, and transfers the message to an event queue for later use by the application task. |
| 3 | "process the display and input directions" | an algorithm (and equivalents) that inspects the type of the incoming message, picks a procedure to execute, and then selects a display and input means command code |

Thus, with these hypothetical claims and constructions in mind, the Court turns to anticipation as the first ground for alleged ensnarement.

### c. Anticipation

An invention is unpatentable where it "was patented or described in a printed publication . . . or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). In this case, as the application for the '282 Patent was filed on August 6, 1987, any reference to "public use" must come before August 6, 1986.

A claim is anticipated under § 102 "if a single prior art reference discloses each and every limitation either expressly or inherently." *Applied Material*, 446 F. Supp. 2d at 550. ("[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation.") (*citing Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F3d 1272, 1282 (Fed. Cir. 2000)). "Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir.

2002).  Moreover, an anticipating reference must not only *disclose*, but must "*enable*[,] that which it is asserted to anticipate."  *Abbot Labs v. Sandoz, Inc.*, 544 F.3d 1341, 1345 (Fed. Cir. 2008).  It is not required, however, "that each limitation of the claims under attack be identified in one embodiment in the single reference," rather, "[i]t is necessary only that all limitations of the claim be found somewhere within the invalidating reference."  *Beloit Corp. v. U.S. Int'l Trade Comm'n*, 845 F.2d 1033, 1988 WL 7837, at *2 (Fed. Cir. 1988) (unpublished table opinion).

Thus, this Court turns to the first alleged invalidating reference here, the ARCO II Report.

### 1.  The ARCO II Report

The following appears undisputed.  Jaired Ellard worked as a computer programmer and software designer for Docutel Corporation between 1972 and 1981.  (D. FoF ¶ 33.) Docutel hired Mr. Ellard to assist in developing an automated gasoline pumping device for Atlantic Richfield Company ("ARCO"). (D. FoF ¶ 36.)  Mr. Ellard created a report, titled "Docutel Corporation ARCO II Automated Service Stations System Evaluation," *i.e.*, the ARCO II Report, offering his recommendations for an automatic service station design. (Ensnarement Hr'g Tr. at 107:6-109:12.)  The features described in this report are the same as those described in the Gentile

27

Patent. (D. FoF Ex. Z(10) (Ellard Depo. at 48:1-13) ("Q. So what is the relationship between the system described in the Gentile patent and the ARCO II system described in [the ARCO II Report]? A. They're the same.").)

The parties dispute whether the ARCO II System was actually in "public use" more than one year before the '282 Patent's effective filing date, and, if so, whether it anticipates the hypothetical claim.

### i. Public Use

Public use includes "any [public] use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1384 (Fed. Cir. 2007) (citations omitted). "The classical standard for assessing the public nature of a use was established in *Egbert v. Lippman*, 104 U.S. 333 (1881)," where a corset's inventor gave two samples of the invention to a lady friend, who used them for more than two years before he applied for a patent. *Motionless Keyboard*, 486 F.3d at 1384. Because the corsets were used for their intended purpose without a requirement of confidentiality, their use was public even though it was unknown to (most of) the public. *Id.*

Thus, to qualify as public use, a device must have been actually used for its intended purpose. *Id.* at 1384-85.

28

That precludes mere limited testing of a device, as a device being tested in a limited manner is not being used in public, for its intended purpose. *Id.* at 1385.

Here, the evidence of prior use is almost entirely limited to a series of *testimonial* statements, given by Mr. Ellard, in the underlying Dresser Litigation. The parties sharply disagree on how much corroboration, if any, is necessary for these statements to prove public use.

Plaintiffs rely heavily on *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354 (Fed. Cir. 1999), for the proposition that a single witness's uncorroborated testimony is insufficient to prove prior public use. *Id.* at 1369-70. As Judge Ellis of this Court noted at-length in *Netscape Communications Corp. v. Valueclick, Inc.*, 704 F. Supp. 2d 544, 555 (E.D. Va. 2010), *Finnigan* has been a source of much confusion. It distinguished, but did not expressly overrule, a previous Federal Circuit decision in *Thompson, S.A. v. Quixote Corp.*, 166 F.3d 1172 (Fed. Cir. 1999), which held that corroboration was necessary only "where the inventor is self-interested in the outcome of the trial and is thereby tempted to 'remember' facts favorable to his or her case." *Id.* at 1175-76. *Finnigan*, meanwhile, held that "corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." 180 F.3d

1369.  It justified this rule in light of the "doubt that

testimonial evidence alone *in the special context of proving*

*patent invalidity* can meet the *clear and convincing evidentiary*

*standard* to invalidate a patent."  *Id.* at 1368 (emphasis added).

　　　*Finnigan's* references to "the special context of

proving patent invalidity," and the "clear and convincing

standard," raise an important distinction between it and this

case, as the parties' respective burdens differ between literal

infringement cases (as in *Finnigan*) and ensnarement cases (as

here).  Here, the parties agree that Defendants bear the burden

of presenting prior art.  (D. CoL ¶ 8 ("[T]he burden of going

forward on ensnarement rests with the accused infringer."); P.

FoF ¶ 128 ("Defendants, as party contesting infringement, have

the burden of coming forward with evidence of prior art to

challenge the hypothetical claims.").)  The tension is over the

*stringency* of Defendants' burden to present prior art.

　　　Where a defendant is accused of literal infringement

and argues that the patent at issue is invalid for reading on

prior art, the defendant must prove invalidity *by clear and*

*convincing evidence*, including the fact that the prior art was

in public use.  *Tate Access Floors, Inc. v. Interface*

*Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002)

("Our law requires patent challengers to prove invalidity by

clear and convincing evidence."); *Mahurkar v. C.R. Bard, Inc.*,

79 F.3d 1572, 1576 (Fed. Cir. 1996) (Defendant "bore the burden of persuasion by clear and convincing evidence on all issues relating to the status of the [reference] as prior art").

But where a defendant is accused of infringing a patent *under the doctrine of equivalents*, it must merely "come forward" with alleged prior art, at which point the plaintiff bears the ultimate burden to prove lack of ensnarement *by a preponderance of the evidence*. *See Streamfeeder*, 175 F.3d at 983-84; *Ultra-Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1364-65 (Fed. Cir. 2000) (defendant alleging ensnarement "must come forward with evidence that the hypothetical claim reads on the prior art"); *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1349 (Fed. Cir. 2010) ("[T]he plaintiff must establish by a preponderance of the evidence that one or more of claims of the patent read on the accused device . . . under the doctrine of equivalents."). In short, while a defendant in an invalidity case must prove invalidity by clear and convincing evidence, a defendant in an ensnarement case must merely make a *prima facie* showing of prior art before the plaintiff must show lack of ensnarement by a preponderance of the evidence.

*Finnigan* therefore does not control this case. *Finnigan* involves literal infringement, not ensnarement. And it justifies its corroboration requirement in light of a

defendant's burden to prove invalidity by clear-and-convincing evidence, a burden that does not apply in the context of ensnarement. Consequently, in an ensnarement case, while defendants bear a *prima facie* burden to come forward with prior art, corroboration testimonial prior use evidence is a matter of *weight* that comes into play *after* the burden shifts to plaintiffs to disprove ensnarement. The plaintiffs must prove, by a preponderance of the evidence, that the prior art was not in public use.

In addressing the credibility of oral statements, the Court considers such factors as: (1) delay between event and trial, (2) interest of witness, (3) contradiction or impeachment, (4) corroboration, (5) witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user. *See In re Reuter*, 670 F.2d 1015, 1021 n.9 (C.C.P.A. 1981). In analyzing corroboration, the Court uses a "rule of reason" analysis. *See Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993).

Here, in the underlying Dresser Litigation, Dresser deposed Mr. Ellard and elicited testimony relating to prior use. His statements were as follows:

Q: And this [ARCO II] is the same system that had units manufactured and installed for public use in California?

A: That's correct.

(D. FoF Ex. Z(10) (Ellard Depo. At 48:11-13).)

Q: And while you were there, did Docutel finish up the automated gas station project that you were working on?

A: Yes.  They actually got it into a limited production.  They actually shipped some systems. I'm sorry.  I don't recall how many they did, but I know they installed several in California.

Q: And these were installed at service stations?

A: They were installed at service stations, yes.

    .  .  .  .

Q: Do you remember at what point did they actually start manufacturing the full-fledged systems?

A: Well, no.  Actually, when I came in there initially, they already had the prototype systems up and running[.]  But I really can't say when exactly they shipped it.  I'm guessing it was less than a year after I initially came to work for them.

Q: So you said that you quit working there in '81?

A: Right.

Q: So it was definitely before '81?

A: Definitely before '81, yeah.

Q: Okay, and these went into stations you said in California?

A: Yeah.

> Q: And were these stations that were open to the
> public then?
>
> A: They were open to the public. You know I know some
> of them were – at least one of the stations had a
> car wash with it because you could request a car
> wash.
>
> Q: You could request a car wash how?
>
> A: I'm not sure, now that you mention it. But the
> reason I remember the car wash is because we had a
> guy who had a stolen credit card, and when his
> credit card came back stolen, the guy shut the car
> wash down with the guy that had stolen the credit
> card inside the car wash. So that's what stuck out
> in my memory.

*Id.* at 10:7-12:9.

> Q: So these recommendations actually made it into the
> production model that was placed in the field?
>
> A: That's correct.

*Id.* at 23:6-8.

Mr. Ellard was disinterested in his relevant
deposition testimony. He had no known motivation for wanting to
prove public use of his invention (except perhaps his pride).
Meanwhile Plaintiffs in the Dresser Litigation had the same
motivation as in the instant matter to challenge Mr. Ellard's
statements regarding prior use, as well as the opportunity to do
so at his deposition. And his statements, in this Court's view,
are credible evidence of public use.[5]

---

[5] Defendants additionally cite "documentary evidence" in the form of a series
of pictures showing gasoline pumps on a factory floor. (D. Resp. at 18.)
Such evidence would clearly not suffice as corroboration under *Finnigan*, as
they do not corroborate these devices being used for their intended purpose,

Chief among these is Mr. Ellard's recollection of the car-wash incident. His memory that a man used one of his devices to order a car wash with a stolen credit card, resulting in that man being trapped inside the car wash, strikes this Court as too uncanny to be the product of pure imagination. Combined with Mr. Ellard's other references to ARCO II being put into production, applying a rule-of-reason analysis, this Court views his testimony as credible.

Plaintiffs further argue that the ARCO II system cannot qualify as "prior art" because its use was "secret" in that members of the public "would not have been able to discern the claimed structure" by reviewing the system's source code. (P. FoF ¶¶ 159-60.) The Court disagrees.

Public use occurs where "an inventor, having made his device, gives or sells it to another, to be used by the done or vendee, without limitation or restriction, *or injunction of secrecy*, and it is so used." *Egbert v. Lippmann*, 104 U.S. 333, 336 (1881) (emphasis added). "[T]he public use itself need not be enabling," however. *Zenith Electronics Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1356 (Fed. Cir. 2008). It need not outwardly describe the full structure of the invention for all to see and recognize, it need simply embody that invention.

---

at most they show that the devices were built. *Motionless Keyboard*, 486 F.3d at 1384-85. Although this Court is not applying *Finnigan*, it still finds this evidence minimally corroborative of public use and therefore minimally useful to its analysis in this case.

*J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1583

(Fed. Cir. 1986). Indeed, were Plaintiffs correct, even if the

ARCO II system was installed at every gas station nationwide, it

probably would still not be in "public use," as consumers using

it would still not be able to see its source code.[6]

*   *   *

Thus, this Court finds that the ARCO II System was in

public use more than a year before the '282 Patent was filed,

and turns to the question of whether it anticipated the

hypothetical claim.

*ii. Anticipation*

With regard to Claim 1 of the '282 Patent, the

parties' dispute is again limited to Element 8. (*See* note 3,

*supra*.) It states, again:

> characterized in that the central
> processing unit includes pump task
> means, display and input task means and
> application task means, each task means, in
> operation running concurrently with the
> other task means, with the pump task means
> controlling the pump means, the display and
> input task means controlling the display
> and input means, and the application task
> means receiving and processing the input
> responses and transferring results into
> pump directions to the pump task means.

---

[6] Plaintiffs cite *W.L. Goer & Associates v. Garlock, Inc.*, 721 F.2d 1540, 1550
(Fed. Cir. 1983), for the proposition that "[f]or the use to qualify as
'public use,' the public must have been able to learn about the claimed
*process* by examining the ARCO II system." (P. FoF ¶ 159 (emphasis added).)
What is being claimed here, however, is a *product*, not a *process*, meaning
that a different standard for prior art applies. *See D.L. Auld. Co. v.
Chroma Graphics Corp.*, 714 F.2d 1144, 1147-48 (Fed. Cir. 1983).

Stated roughly, Element 8 requires a CPU with means for
controlling a pump task, a display and input task, and an
application task, running concurrently.  Although the parties
dispute anticipation of each part of this element, this Court
will short-circuit (so to speak) that debate by turning directly
to Element 8(b), which requires "[three task means] in operation
running concurrently."

Paragraph 5 of the ARCO II Report stated:

> *It is recommended that a multiprogramming
> monitor system be developed* which permits a
> more systematic development of the ARCO II
> software.  The monitor would partition the
> system into real-time tasks and non real-
> time tasks.  Its goal is to isolate the
> time dependent tasks from the application
> programs so that all operations involving
> interrupt handling and input/output are
> performed in a uniform manner by the
> monitor.  *The monitor will be able to
> support multiple programs running
> concurrently.*

At the Ensnarement Hearing, Plaintiffs' Expert Dr.
Beazley explained that although this discloses "concurrent
operations of multiple programs," it does not disclose Element
8(b) because it refers to running multiple programs for multiple
tasks on a single machine, as opposed to running one program for
multiple tasks.  (Ensnarement Hr'g Tr. at 111:7-23.)  Recalling
that this Court's Markman Opinion defined the term "running
concurrently" as "executing multiple *tasks* at the same time in a

37

single central processing unit," and defined a "task" as "a *software* module separately controlled by a multitasking operating system," the Court here agrees with Dr. Beazley.

Critically, in arguing that the Gentile Patent could be implemented as a multitasking operating system, Defendants refer to language in the patent stating:

> Any information generated in the terminal console 12 is transmitted to the computer 42 through the terminal control 44 used as a data collector/transmitter. *By appropriate multiplexing circuitry*, the controller operates in such a manner that the computer 42 appears to be communicating with three separate devices individually.

'497 Patent at 6:6-12 (emphasis added). But as both experts agree, circuitry is not software. (Ensnarement Hr'g Tr. at 95:7-96:3 (Dr. Beazley testifying repeatedly that "[t]his is hardware, not software"); 293:19-294:23 (Dr. Grimes testifying regarding this language that "[m]ultiplexing circuitry described here is circuitry, which is not software"). Thus, although both patents may describe multitasking operating systems, if the '282 Patent multitasks via software and the Gentile Patent multitasks via hardware, the Gentile Patent does not disclose Element 8(b) of the hypothetical claim. Thus, this Court finds that the ARCO II System does not anticipate the '282 Patent.

*2. The '777 Patent*

Turning to the '777 or "Pearson" Patent, and returning
to this Court's adopted task means constructions, Plaintiffs
argue that the underlined portions of the structures listed
below for Pump Task Means are present in the hypothetical claim,
but not in the Pearson Patent.   (P. FoF ¶ 78.)

"Pump Task Means" Construction

| Claim | Function | Corresponding Structure |
|-------|----------|-------------------------|
| 1 | "control the pump means" | an algorithm (and equivalents) that <u>selects a pump command code, creates a control message</u> that includes the command code, and <u>writes the control message</u> on the connection between the CPU and the pump. |
| 2 | "process the pump directions and transfer pump commands to, and receive pump responses from, the pump means" | an algorithm (and equivalents) that <u>inspects the pump direction</u> to select a procedure to execute and then, in the chosen procedure, selects a <u>pump command code</u>, creates a <u>control message</u> that includes the command code, <u>writes the control message</u> on the connection between the CPU and the pump, and <u>reads the pump response</u> on the connection between the CPU and the pump. |
| 3 | "process the pump responses and transfer resultant pump requests to the application task means" | an algorithm (and equivalents) that <u>inspects the pump response data, creates a pump event message, and transfers the message to an event queue</u> for later use by the application task. |

At the Ensnarement Hearing, Dr. Beazley testified that
none of the underlying portions above are found in the '777
Patent, and gave similar testimony with similar illustrations
for Display and Input Task Means and Application Task Means

constructions. (Ensnarement Hr'g Tr. at 130:23-132:7.) As he put it, these parts are "just not there." (Ensnarement Hr'g Tr. at 13.) Dr. Grimes's testimony on the topic referred to his expert report and, with respect to Display and Input Task Means, to his Deposition along with his report. (Ensnarement Hr'g Tr. at 217:13-218:15; 284:3-285-14.) Defendants Proposed Findings of Fact referred to the same materials, with no further explanation or response to Dr. Beazley's testimony. (D. FoF ¶ 84.)

Recalling that the burden of persuasion lies with Plaintiffs, this Court finds Dr. Beazley's testimony more credible on this issue than Dr. Grimes's testimony and expert report. Dr. Grimes's report analyzes the 777 Patent in detail, but it does not appear to conform to the Court's claim construction language. Specifically, it does not point out the presence of the elements within that language that Dr. Beazley claims identifies as missing. Nor is it clear from Dr. Grimes's analysis that Dr. Beazley's claims are incorrect. The Court carefully reviewed the portions of Dr. Grimes's expert report on which he and Defendants rely, and, to the Court's reading, nothing within that report appears responsive to the structures Dr. Beazley identified as missing.

To illustrate, this Court need look no farther than its construction of the term "control the pump means." Dr.

Beazley again found that the underlined portions from the
Court's construction are not to be found within the '777 Patent:

> an algorithm (and equivalents) that <u>selects
> a pump command code, creates a control
> message</u> that includes the command code, and
> <u>writes the control message</u> on the
> connection between the CPU and the pump.

The relevant portion Dr. Grimes's report, however, states
nothing responsive to these allegedly missing parts.  First, it
simply refers to portions of the patent where "the corresponding
structure is disclosed," none of which (appear to) show
selection of a pump command code, creation of a control message,
and writing of that message on the connection between the CPU
and the pump.  Next, it states:

> The dispensers each contain their own
> microcomputer that provides the direct pump
> control in cooperation with CPU.  "The CPU
> processes the incoming data and provides
> output signals to a pump control circuit
> which is employed to actuate the dispenser
> pump or valve and auxiliary valve once the
> dispenser is armed and the customer is
> ready to begin dispensing fuel."

(Grimes Expert Report Ex. 2 (quoting '777 Patent 15:31-36)
(citations omitted).)  It goes on, quoting directly from the
patent:

> Next, the system is ready for the
> dispensing of fuel.  In this mode, the CPU
> decrements the all 8's timer, sets the
> valve and motor signals "on", enables
> interrupts (pulses from flow pulser),
> checks communications and determines from
> RAM status buffer emergency bit whether the

> operation is a new delivery or continuation
> of a delivery interrupted by an emergency
> "off" signal from the operator . . . This
> routine also checks for slow-down and if
> total gallons dispensed is within 0.3
> gallons of the preset or allocation limit,
> provides a turn off signal for the main
> valve.  When the gallon value is equal to a
> preset or allocation limit, the slow flow
> valve is turned off.

(Grimes Expert Report Ex. 2 (quoting '777 Patent 19:30-54)
(citations omitted).)

This Court cannot be certain that a refutation of Dr. Beazley does not lie buried somewhere within Dr. Grimes's analysis.  But without additional direction or explanation from Dr. Grimes, because this Court finds Dr. Beazley's testimony credible, this Court must also find that the hypothetical claim does not read on the '777 Patent with respect to pump task means, meaning that there is no ensnarement by anticipation with respect to this patent.

Thus, this Court does not reach the question of anticipation for the remaining elements of Claim 8, and turns to Defendants' allegations of obviousness.

### d. Obviousness

Thus, this Court now turns to the question of whether the hypothetical claim would have been obvious in light of the prior art.  A hypothetical claim is obvious where "the differences between the subject matter sought to be patented

[i.e., the hypothetical claim] and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (emphasis added).

Four factors are to be considered in an obviousness inquiry: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; and (3) the differences between the claimed invention and the prior art, and (4) secondary considerations such as commercial success, long felt but unsolved needs, or the failure of others to achieve comparable results. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). An obvious analysis may draw from multiple pieces of prior art, though that art, "when viewed *in toto*, must not only disclose the components of the [hypothetical claim], but also present some teaching, incentive or desirability to combine the elements in the particular manner disclosed in the patent as a whole." *Mars, Inc. v. Coin Acceptors, Inc.*, No. CIV A 90-49, 1996 WL 34385063, at *2 (D.N.J. Sept. 3, 1996); *see also Zweiman*, 25 F. App'x at 940. In other words, "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 692 (2007). The Court must "look to interrelated teachings of multiple patents;

the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 418.

Defendants make much of Dr. Beazley's failure to explicitly apply the *KSR* standard when opining on obviousness. (*See* D. CoL ¶¶ 20, 21.) And it is indeed true that Dr. Beazley did not even know of *KSR*, let alone apply it, in this case. (Ensnarement Hr'g Tr. at 160:18-161:2.) It became clear during redirect, however, that while Dr. Beazley was not familiar with *KSR*, his analysis was consistent with *KSR*, and when asked whether he saw "any sort of suggestion or motivation, in any of the prior art that the defendants have presented that would lead a person of ordinary skill in the art to combine references to render the hypothetical claim invalid," he reaffirmed his opinion that nothing within the prior art suggested "the system architecture of tasks and concurrency that's used in the '282 patent." (Ensnarement Hr'g Tr. at 202:9-203:13.) Thus, this Court will consider Dr. Beazley's findings to the extent those findings inform this Court's *KSR* analysis.[7]

_____

[7] Defendants cite two cases in arguing to strike Dr. Beazley's testimony, both of which are inapposite. In *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1115-17 (Fed. Cir. 1996), the expert repeatedly opined on what the legal standard

This Court begins with the background knowledge a person of ordinary skill in the art would have had at the time of the claim. Dr. Beazley testified that such a person "would typically have had three to five years of programming experience in the field of computer systems and computer-controlled hardware devices." (Ensnarement Hr'g Tr. at 144:5-11.) He further testified that in 1985, a person of ordinary skill in the art was familiar with CPUs. (Ensnarement Hr'g Tr. at 145:20-146:1.) He said that such a person would be aware of display and input means, in terms of card readers, keyboards, and similar interfaces. (Ensnarement Hr'g Tr. at 151:20-25.) He said that such a person would be aware that display and input means could send and receive responses to and from the CPU. (Ensnarement Hr'g Tr. at 152:1-10.) Likewise for pump and application task means, he testified that a person with ordinary skill in the art would know how to control that hardware with a CPU. (Ensnarement Hr'g Tr. at 152:16-24.) Finally, he testified that "except for cooperation between the tasks,

---

actually was, albeit incorrectly, and his opinions were invalidated for that reason. Here, however, Dr. Beazley never professed to be a lawyer or to even know what *KSR* was. In *American Medical Systems, Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 900-01 (D. Minn. 2010), the Court struck an expert who failed to properly apply the correct legal standards stated in his report to the facts of that case. Here, Defendants simply argue that Dr. Beazley failed to apply the *KSR* standard explicitly, they do not point out *where* (if ever) Dr. Beazley's analysis was inconsistent with *KSR*. Of course, Defendants are not *obligated* to identify such inconsistencies, as the burden for proving lack of obviousness lies with the Plaintiffs. Still, however, this Court will only discount Dr. Beazley's testimony where it finds it to be inconsistent with *KSR*. And at least as generally stated, Dr. Beazley's test for obviousness does not conflict with *KSR*.

persons of ordinary skill in the art were aware of all the constituent elements of Element 8." (Ensnarement Hr'g Tr. at 154:8-7.)

As to cooperation between tasks, Dr. Beazley explained he was referring, for example, to the application task receiving input responses and giving results and pump directions to the pump task means. (Ensnarement Hr'g Tr. at 155:4-8.) He then stated, however, that "the concept of a task sending information to another task" actually was known to people doing computer systems. (Ensnarement Hr'g Tr. at 155:14-156:14, 157:16-158:16.) Specifically, he stated that "they were aware that you could have tasks communicating with other tasks. . . . In the general sense. . . . [N]ot specifically an application task to a pump task." (Ensnarement Hr'g Tr. at 157:16-23.) In short, Dr. Beazley appears to have testified that while a person skilled in the art would have known that, in general, tasks could communicate with each other via a multitasking system, the prior art showed that no one incorporated this technology into a gas pump.

Here, under the first *Graham* factor, the prior art at issue with respect to obviousness includes the ARCO II System, the '777 Patent (the Pearson Patent), United States Patent No. 4,395,627 (the "'627 Patent" or the "Barker Patent"), and United States Patent No. 4,630,754 (the "'754 Patent" or the "Komukai

Patent"). As this Court has already found that the ARCO II System did not disclose concurrent operation of separate tasks in a multitasking system, this Court turns to the question of whether the remaining patents disclose the element of concurrency.

The experts' Ensnarement Hearing testimony with regard to these issues was more or less uniform for all three patents. Dr. Beazley testified that all three patents disclosed sequential operations, as demonstrated by linear flowcharts. He testified that, with the Komukai Patent, "the big thing is that there's not concurrent execution of separate tasks. You essentially have a system where it's just one big sequential operational sequence. You have one flowchart. You're stepping through that flowchart." (Ensnarement Hr'g Tr. at 87:21-24.) And he testified that the same was true for the '777 and '627 Patents--both were purely sequential, and neither was any better than the Komukai Patent. (Ensnarement Hr'g Tr. at 127:2-128:25, 133:15-134:6.)

Dr. Grimes responded to these arguments by pointing out that flowcharts are always sequential, and that in reality the flowcharts represent individual users of individual pumps at a common terminal operating at the same time. (Ensnarement Hr'g Tr. at 277:18-278:8.) He further explained that were Dr. Beazley correct, then only one person could operate a pump at a

terminal at a time, which is simply not how gas pumps work, and
not how any of the alleged prior-art patents were described.
(Ensnarement Hr'g Tr. at 278:18-24.)  Despite this testimony,
this Court cannot ignore the fact that Defendants, in
prosecuting the '282 Patent on Touchcom's behalf, actually
argued that what distinguished it from the Kokumai Patent was
that the '282 Patent's tasks ran concurrently, whereas the
Kokumai Patent's tasks were sequential.

Indeed, one gets a sense of deja-vu in reading
Defendants' December 15, 1989 letter to the PTO, in which they
stated:

> With regard to [the Komukai Patent, it]
> does not disclose an application task and
> other tasks running concurrently to oversee
> the various parts of the system.  The
> application task can thus initialize the
> system and wait for events to incur as
> sensed by the other tasks.  When an event
> occurs the application task calls on the
> appropriate task to handle the situation.
> It is the ability of the application task
> to wait for an event and respond which
> allows for sophisticated handling of events
> not disclosed in [the Komukai Patent].
>
> Additionally, a separate task structure,
> when run in protected mode, can confine
> many problems to the task in which the
> problem has occurred.
>
> [The Komukai Patent] uses a programme which
> sequentially steps through a transaction.
> The programme must reach the next step in
> the transaction and check what the user has
> done before the programme can determine
> whether the response is appropriate.  In

> order to keep the reaction time of the
> programme to a reasonable level the
> programme must have fairly unsophisticated
> event handling capabilities.  As well, a
> sequential programme will fail when a fault
> occurs within the hardware or software.
> Also it does not use separate task to
> communicate with the various parts of the
> system.

(P. FoF ¶ 12, Ex. 48, at TCVA00004152-54.)  In short, Defendants

used concurrency to vouch for the '282 Patent's patentability

over Komukai in 1989, but now claim that the hypothetical

claim's concurrency was actually obvious to those skilled in the

art at the time.

Defendants' only response to this is to point out that

the PTO granted the '282 Patent based on this distinction before

the Supreme Court's *KSR* opinion, meaning that *KSR's* standard for

obviousness was not applied to the '282 Patent.  (*See D. Resp.*

at 10 n.23.)  The relevance of this argument is questionable, as

the issue here is whether the hypothetical claim *would have* been

viewed as ensnaring the prior art due to obviousness *during the*

*Dresser Litigation* (*i.e.*, from 2003 to 2005, two years before

*KSR*), thereby preventing the Plaintiffs from winning an

infringement action against Dresser (and preventing a

malpractice claim here).  Still, the presence or absence of *KSR*

has little impact upon the import of Defendants' letter with

respect to Kokumai.

*KSR* rejected a *rigid* application of the "teaching, suggestion, or motivation" ("TSM") test, under which "a patent claim is only proved obvious if some motivation or suggestion to combine the prior art teachings can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill." *KSR*, 550 U.S. at 407 (citations and internal quotation marks omitted). But *KSR* did not reject the TSM test altogether, indeed it noted that the TSM test captures the "helpful insight" that reasons may exist for persons of ordinary skill in the relevant fields to combine prior elements. *Id.* at 418. Rather, *KSR* rejected the application of this test in such a way as to require rigid fact-finding as to prior teaching, suggestion, or motivation, such as identification of published articles or issued patents. *Id.* at 419.

Thus, Defendants might argue, the PTO granted the '282 Patent under what *may*[8] have been a lessened standard of obviousness, meaning that this Court should not make much of what the PTO did. Perhaps so, but this does not change the

---

[8] Indeed *KSR* itself shows that it is far from clear whether the PTO used a strict reading of the TSM test in considering whether the concurrency vouched for was obvious or not when considering the '282 Patent. The Supreme Court noted in *KSR* that, "[i]n the years since the Court of Customs and Patent Appeals set forth the essence of the TSM test, the Court of Appeals no doubt has applied the test in accord with [*KSR's*] principles in many cases." 550 U.S. at 419. Indeed, between the Appeals Court's decision in *KSR* and the Supreme Court's decision reversing it, the Federal Circuit used a broader conception of the TSM test than it applied in *KSR*. *Id.* at 421-22 (citing multiple cases). Thus, the Federal Circuit's strict application of the TSM test in *KSR* may well have been an aberration that the Supreme Court corrected, not a statement of the pre-existing norm that would have dictated the Dresser Litigation, had the issue arisen.

essence of what *Defendants* argued to the PTO, which was that what separated the '282 Patent from the prior art was the '282 Patent's use of concurrency.  That fact breaks the deadlock between Drs. Beazley and Grimes's opinions as to whether the prior art discloses concurrency or not.  Dr. Beazley testified that the '777 and '627 patents disclosed operations that were just like Kokumai's.  Dr. Grimes did not address this testimony, and Defendants present no grounds for differentiating Komukai from these other patents.  This Court therefore accepts Dr. Beazley's testimony that the alleged prior art is no better than Komukai, and accepts Defendants' arguments, *as stated in their December 15, 1989 Letter*, that the Komukai Patent should be distinguished for disclosing merely sequential operations.  If none of the prior art discloses any more concurrency than Komukai, and if Komukai did not itself disclose concurrency, than concurrency was simply absent from the prior art, and cannot be found to have been obvious, under *KSR or* the TSM test.

\*     \*     \*

Thus, this Court finds that the proposed equivalent claim does not ensnare the prior art, and therefore will deny summary judgment for lack of infringement under the doctrine of equivalents.

## C. TTI's Standing to Sue B&P

Defendants argue that, for several reasons, TTI lacks standing to sue B&P. Among these, Defendants claim that TTI maintained no attorney/client relationship with B&P that could give rise to a legal malpractice suit. (MSJ at 22-23.) In support of this argument, Defendants cite numerous facts, none of which prove the non-existence of such a relationship. Defendants point out that TI and TTI are separate corporate entities, and that TI's relationship with B&P would not automatically carry over to TTI. (MSJ at 22.) Defendants point out the absence of an express agreement between TTI and B&P. *Id.* at 22-23. And Defendants downplay TTI's having paid B&P's legal bills. *Id.* at 23. In light of Plaintiffs' evidence in response, Defendants' evidence is not enough to prove absence of an attorney/client relationship for purposes of summary judgment.

Plaintiffs present sufficient evidence that a jury could find that an attorney/client relationship existed between TTI and B&P. This evidence includes:

- TTI's paying for B&P's ongoing services; (Opp. at 22),

- Statements, allegedly made by Hollidge to Defendant Frost, explaining that TTI was taking over development of the technology, and instructing Frost as to his duties going forward; *id.,*

- B&P's internal records and correspondence, allegedly indicating that B&P considered TTI a client unto itself; *id.* at 23-24.,

- A December 20, 1990 letter, from Frost to Hollidge at "Touchcom Technologies, Inc." "providing advice about legal developments with the U.S. patent application; *id.* at 24., and

- A December 5, 1991 letter, from a B&P attorney to Hollidge at "Touchcom Technologies Inc.," responding to a request for legal advice, and indeed providing legal advice (albeit not necessarily related to the '282 Patent); *id.*

This evidence may or may not convince a jury that TTI was B&P's client. But a reasonable jury could reach that conclusion. *See Anderson*, 477 U.S. at 248 (genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party"). This Court will therefore deny summary judgment for lack of standing with respect to TTI.

D. TI's Standing to Sue B&P

Defendants argue that TI assigned to TTI its rights to recover for violations of the '282 Patent in a 2003 amendment to the companies' license agreement, meaning that TI had no right to recover damages in *Dresser*, and, therefore, no standing to sue Defendants for malpractice. (MSJ at 25-27.) Plaintiffs protest that the 2003 Amendment was not signed and that the underlying agreement did not allocate which party would receive patent infringement proceeds. (Opp. at 25-26.) In support of

the latter claim, Plaintiffs cite the agreement, which stated that all patent rights for the technology at issue here "shall continue to be owned by Licensor," *i.e.*, TI.

Of course, that agreement was allegedly amended in 2003. And, while the amendment itself may be unavailable, Hollidge's deposition testimony strongly indicates that indeed, TI assigned all proceeds from litigation enforcing patent rights. Asked whether the statement "[a]ll proceeds regarding such litigation . . . shall be the sole and exclusive property of the licensee" accurately reflects the action that was taken by TI and TTI's boards' of directors, Hollidge answered: "That is correct." (Reply at 17; *see also* MSJ at 27.)

Plaintiffs present no evidence to contradict Hollidge's statement. Rather, Plaintiffs argue that reliance upon that statement would violate the best evidence rule. (MSJ at 26 n.31.) Federal Rule of Evidence 1002 provides that "[t]o prove the content of a writing . . . the original writing . . . is required." The Rule exists to protect against inaccuracies and fraud, *United States v. Smith*, 566 F.3d 410, 413 (4th Cir. 2009), and requires the production of original documents as opposed to copies, *see Seiler v. Lucasfilm, Ltd.,* 808 F.2d 1316, 1318 (9th Cir. 1986).

Here, Plaintiffs do not cite Hollidge's testimony to "prove the content" of the alleged 2003 Amendment. Rather,

Plaintiffs cite Hollidge's testimony to prove *the fact* that the TI and TTI boards of directors granted TTI the sole and exclusive right to collect proceeds from litigation enforcing patent rights. (*See* MSJ at 17; Reply at 27; *see also Smith*, 566 F.3d 414 (explaining the distinction between proving content and proving a fact).) Hollidge's testimony is therefore not barred by the best evidence rule.

Hollidge's statement raises serious doubt as to whether TI retained any right to recover proceeds in *Dresser*. Because Defendants have not put forth any evidence to dispute its truthfulness, no dispute appears to exist regarding this issue. Therefore, because the possibility of recovery in *Dresser* is a requirement for maintaining a malpractice action against the Defendants, TI cannot maintain such an action. This Court will therefore grant summary judgment with respect to TI.

### IV. Conclusion

To summarize, this Court finds the following.

First, a genuine dispute exists as to whether Defendants continued to represent Plaintiffs at the time of the Dresser Litigation.

Second, the Dresser Device did not literally infringe the '282 Patent.

Third, a genuine dispute exists as to whether the Dresser Device infringed the '282 Patent under the doctrine of

equivalents, and the proposed Hypothetical Claim would not be invalid due to ensnarement of the prior art.

Fourth, a genuine dispute exists as to whether an attorney/client relationship existed between Plaintiff Touchcom Technologies, Inc. and Defendant Bereskin & Parr.

And Fifth, no attorney/client relationship existed between Plaintiff Touchcom, Inc. and Defendant Bereskin & Parr, meaning that Touchcom, Inc., is without standing to proceed in this matter.

For these reasons, the Court will grant in part and deny in part Defendants' motion. An appropriate order will follow.


May 18, 2011                    _____/s/_____
Alexandria, Virginia                    James C. Cacheris
                            UNITED STATES DISTRICT COURT JUDGE